# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NEW GENERATION DEVICES,          :
INC.,                            : Civil Action No. 04-2583(KSH)
                                 :
            Plaintiff,           :
                                 : Newark, New Jersey
      vs.                        :
                                 :
SLOCUM ENTERPRISES, INC.,        :
et al.,                          :
                                 :
            Defendants.          : Monday, May 23, 2005
- - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF DECLARATORY JUDGMENT MOTION
BEFORE THE HONORABLE PATTY SHWARTZ, U.S.M.J.

APPEARANCES:

FOR THE PLAINTIFF:        BY:  MICHAEL R. FRISCIA, ESQ.,
                               MARK NIKOLSKY, ESQ.
                          (McCarter & English)
                          Four Gateway Center
                          100 Mulberry Street
                          Newark, NJ  07102

FOR THE DEFENDANTS:       BY: ARIANNA FRANKEL, ESQ.,
                          (Brown, Raysman, Millstein,
                          Felder & Steiner)
                          163 Madison Avenue
                          Morristown, NJ 07962
                               -- and --
                          BY:  DAVID P. COOPER, ESQ.,
                          (Kolisch Hartwell, PC)
                          520 S.W. Yamhill Street
                          Portland, OR  97204

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

***************************************************************
RAPID TRANSCRIPT SERVICE, INC.
4 Elodie Lane
Randolph, New Jersey 07869
(973) 328-1730   FAX (973) 328-8016
***************************************************************

I N D E X
5/23/05

ARGUMENT                                    Page
    By Mr. Cooper                          4,33
    By Mr. Friscia                         19,38

COURT DECISION                              41

Colloquy                                                              3

1    THE COURT:  May I have appearances starting with
2    the plaintiff, please?

3    MR. FRISCIA:  Yes, Your Honor.  Michael Friscia,
4    McCarter & English, attorney for plaintiff, New Generation
5    Devices, Inc.

6    THE COURT:  Okay.  And for the defendant?

7    MR. COOPER:  Good morning, Your Honor, David
8    Cooper for the Slocum defendants, and local counsel, Arianna
9    Frankel.

10   THE COURT:  Okay.  Thank you, Counsel.  I've had
11   an opportunity to read all of the submissions that have been
12   made and I have some specific questions for counsel, so you
13   should not feel compelled to review -- repeat what was in
14   your papers, because I did read them, and all the
15   attachments.

16   The motion is the defendant's motion, so if
17   there's something you'd like to add to your papers, I'm
18   prepared to hear you.  So go ahead.

19   MR. COOPER:  Okay.

20   THE COURT:  And I can see from here.

21   MR. COOPER:  Can you?

22   THE COURT:  Yep.  Have you had an opportunity to
23   share with your adversary what it is you expect to be showing
24   us today?

25   MR. COOPER:  Yes.

Argument                                4

1           MR. FRISCIA:  Moments ago.

2           MR. COOPER:  Moments ago.

3           THE COURT:  Do you --

4           MR. COOPER:  But it's just these four slides.  I

5  think it will -- it will be -- it's just going to be brief.

6           THE COURT:  Mr. Friscia, do you have any

7  objection?

8           MR. COOPER:  Well, I'm not -- I haven't looked at

9  the content.  I may have some questions.  I don't know what

10  it is exactly.

11           THE COURT:  Okay.  Do you have any objection if we

12  look together?

13           MR. FRISCIA:  No.

14           THE COURT:  Okay.

15           MR. COOPER:  Okay.

16           THE COURT:  Okay, Counsel.  Go ahead.

17           MR. COOPER:  Okay.  Let's take it from here --

18  anyway, Your Honor, in addition to our papers, I thought I

19  would just at least have a setting for us today of the --

20  just the basics of the analysis.

21           First of all, we're two -- Slocum Trust and Slocum

22  Enterprises are two out-of-state entities, and the basic

23  analysis from the Inamed case is the two-part state and

24  federal.  We've got the New Jersey long arm statute and I

25  think there's no dispute that it has a catch-all provision

Argument                                                    5

1  that goes to the far reaches of due process, so it really

2  becomes one analysis, which is a Federal constitutional due

3  process analysis.  And that's the Inamed case, and then --

4  I'm going to do this a little out of order.

5         THE COURT:  That's okay.

6         MR. COOPER:  And so then we'll go to genetic

7  implant and the Deprenyl case, which has been cited in the

8  papers for the three-part test that the Federal Circuit

9  applies to do the due process analysis.  So we've got just

10  the basics of whether each of the Slocum defendants purposely

11  directed their activities at the forum, whether New

12  Generation's claim for a declaratory judgment of non-

13  infringement and invalidity arises out those activities, and

14  then whether the assertion of personal jurisdiction over each

15  of the defendants would be reasonable and fair.

16         I'd like to just point out, in addition to our

17  papers, then and looking to your questions -- and there's

18  just two other slides here.  What we've done is just

19  graphically represented what is in the briefs, and what I was

20  just talking with Mr. Friscia about when you came in.  So

21  1999 to 2004 there were a very small number of new licensees

22  in New Jersey -- new licensees meaning, licensees of Slocum

23  Trust.

24         THE COURT:  So is this chart that we're looking at

25  -- for the purposes of the record, it's a bar graph, that

1  reads number of New Jersey -- new New Jersey licensees 1999

2  to 2004, each of the bars indicate additions, not the number

3  of active licenses on a -- in a particular year?

4              MR. COOPER:  Correct.

5              THE COURT:  Okay.

6              MR. COOPER:  So what this bar represents is the

7  number of new New Jersey licensees for a given year from 1999

8  to 2004, and in the papers we note that there was one in

9  1999, two in 2000, one each in 2001 and 2002, four in 2003,

10 and three in 2004.

11             THE COURT:  So what -- what would your total

12 licensees be, 13?

13             MR. COOPER:  Out of those -- I would like to

14 clarify that for the record as well today.

15             THE COURT:  Okay.  Because I did see seven, 13, I

16 saw different numbers, so please do.

17             MR. COOPER:  Yeah.  So this -- and to sub that, we

18 have the total New Jersey licensees, and then we also have

19 what this bar graph just is meant to hopefully help in

20 understanding, is just the relatively small number of new

21 licensees year-to-year from '99 to 2004.

22             The total number of New Jersey licensees, as of

23 June 2 of 2004, when New Generation filed their N.J. action,

24 and when -- that is the date under the case law that would

25 determine contacts for personal jurisdiction, there were 11

1   licensees.  Our reply brief to you noted 12 and that was a

2   mistake on our part.  We counted two of the licensees twice,

3   but it refers to a document that was produced in

4   jurisdictional discovery that both sides have reviewed, and

5   that clarifies in that document the 11 -- it lists 12, but

6   there is one party -- one of the licensees is listed twice;

7   once in a list at the top of the document, and then footnoted

8   at the bottom.

9          We've got two licensees -- in order to calculate

10  the number of licensees in New Jersey as of June 2004 we

11  looked at one licensee who had moved into New Jersey during

12  that time, but actually became certified outside of New

13  Jersey, and then there was another New Jersey licensee that,

14  as it turns out, left in August or September of 2004, but we

15  still felt it was accurate to count that person, because as

16  of June they were still there.

17          THE COURT:  Okay.  Thank you.

18          MR. COOPER:  So anyway, this is just again a

19  graphic rather than a numerical representation of those

20  numbers.  So I'm hoping that that's not controversial and

21  it's just another way to describe it.

22          Similarly, and now if we just go to the total

23  number of licensees that Slocum Trust had as of June 2, 2004,

24  that was 992, and then the total number of New Jersey

25  licenses at that time was 11.

Argument                                                      8

1          THE COURT:  Are you able to tell me where this --

2   what state has the most number of licensees?

3          MR. COOPER:  I'm not.  You know, I can tell you we

4   didn't do that analysis.  I just know that it's -- you know,

5   it's --

6          THE COURT:  Are you able to tell me where the most

7   amount of business occurred, because I note the papers talk

8   about basically less than 1 percent of all total sales

9   occurred in New Jersey.  My question, if you know the answer

10  is, where were the largest number of sales?

11         MR. COOPER:  In a particular state, I couldn't

12  tell you.  My best guess would be that west of the

13  Mississippi versus east of the Mississippi.

14         THE COURT:  Okay.  Go ahead.

15         MR. COOPER:  Anyway, so these are really just --

16  I'm offering these as other graphic examples of how small the

17  New Jersey contacts and/or business are to Slocum Trust, and

18  I'm focusing specifically on Slocum Trust right now, and I'd

19  like to make sure that the Court's aware of, and you're

20  comfortable with the understanding of the Trust's role and

21  Slocum Enterprises's role.

22         THE COURT:  I am.  I am.  Thank you.

23         MR. COOPER:  So that's great.

24         So as patent owner and a necessary party to this

25  litigation, it's defendant's view that there's just simply no

1  purposefully directed activity by the Trust.  To the extent
2  that the Court was going to conclude that somehow the
3  certifying of these licensees was purposefully directed at
4  New Jersey, even though it's really by coincidence that they
5  happen to be from New Jersey, it's not as if the Trust is
6  targeting New Jersey veterinarians and saying, we'd like you
7  to become part of our licensee network.

8          The -- these 11 licensees in no way relate to the
9  case that New Generation is bringing, which is a declaratory
10 judgment for non-infringement and invalidity of the patents
11 relative to New Generation's --

12         THE COURT:  What about -- one of the terms of the
13 licenses, as I read it, and I'm going to use very plain
14 language here, suggests that the licensees had to be the eyes
15 and ears of the patent holder.  That is, if you hear of
16 infringement, report it, so that we can protect the patent.

17         Why wouldn't that be a finger in the District
18 where they're asking someone to protect the patent, and
19 wouldn't that be enough to allow the arising out of factor to
20 be satisfied?  Do you follow my -- do you follow what I'm
21 pointing to in the license?

22         MR. COOPER:  I think I -- I definitely follow what
23 you're talking about in the license.  The -- but I, first of
24 all, don't see any relationship yet, because it's a
25 declaratory judgment action that New Generation brought, so I

 1  don't see how that arises in any way to whether or not New
 2  Generation's Device infringes the Slocum Trust patent.  That,
 3  to me, is the central --

 4            THE COURT:  And I will certainly have some
 5  questions for the other side about the arising out of prong
 6  of the test.

 7            MR. COOPER:  Right.

 8            THE COURT:  So go ahead.

 9            MR. COOPER:  And then secondly, while the
10  provision is in the license, the -- still with the three-part
11  test and the extremely small number of licensees in New
12  Jersey, it would be Slocum Trust and Slocum Enterprises's
13  view that that just simply doesn't rise to a level of
14  contacts that would make the exercise of jurisdiction
15  constitutional.

16            THE COURT:  What do you think would be enough?
17  Because apparently, New Generation didn't think they -- their
18  contacts were sufficient in Oregon in your patent --

19            MR. COOPER:  Right.

20            THE COURT:  -- kind of affirmative patent case,
21  what would be enough contacts?

22            MR. COOPER:  Yeah, and it's a very good question,
23  a difficult one, and I don't know that it's one that I can
24  answer, and I think the case law supports me in that.  You
25  know, there's no bright line.  If you look at the Federal

1  Circuit cases, and I think the cases we cited to you, they're

2  really supportive of our conclusions that when you're down in

3  the less than 1 percent range of business and/or licensees,

4  you know, the case law I think is solid for us that that

5  simply isn't enough.

6          What level would be enough?  Would 2 percent, 5

7  percent, 10 percent?  I don't think the analysis is about --

8  is that objective anyway, so I think that's the reason you

9  don't really see it in the case law either, but I just feel,

10  you know, that what's very clear about these facts, and

11  particularly about the Trust, but just as well about the

12  Enterprises, but I just thought it was, for purposes of

13  today, if you feel comfortable on the papers we provided, I

14  just wanted to emphasize our view as far as the Trust and its

15  lack of contacts with New Jersey.

16          THE COURT:  Did you want to address the

17  Enterprises separately?

18          MR. COOPER:  You know, other than to tell you, you

19  know, what we've already described and the fact that the

20  amount of business again is less than 1 percent, and

21  analogous to the Trust, the amount of business that goes on

22  is not business that's interactive in any way that New

23  Generation -- as New Generation tried to describe in their

24  briefs, and it simply requests by New Jersey licensees for

25  product, as we get requests throughout the country.

1    THE COURT:  Okay.  And I'm with you that I do

2 think the discussion should be the Trust versus Enterprises.

3 So if I could ask then some questions about Enterprises.

4    MR. COOPER:  Sure.

5    THE COURT:  Website -- the Enterprises website,

6 it's been described, depending on which papers I read, as

7 passive or interactive, but what's been a nice surprise in

8 the papers is factually, you don't really dispute things, you

9 just characterize things differently, and as I look at the --

10 the description of the website for Slocum Enterprises, it

11 suggests that, to the extent there's an ability to interact,

12 it's basically an ability to click on a -- sort of a jump

13 site, you get to -- automatic sort of e-mail, and you get to

14 send a communication, but you couldn't order something that

15 way.

16    Am I understanding the operation correctly or

17 could you actually order something?  If I sent an e-mail

18 ordering something over the -- over your web --

19    MR. COOPER:  The -- the answer is no from the

20 standpoint of interacting with that website or that host

21 server, as New Generation tried to describe.  An interactive

22 website today to do electronic commerce means that you

23 actually -- not talking to a person, but actually can access

24 that website, enter billing information, you know, basically

25 do the whole thing; order the product and have it shipped to

1   you.

2            The way that Slocum Enterprises's website works is
3   very much it's an alternative to somebody faxing in an order
4   or calling on the telephone.  It just allows them, you know,
5   a vehicle to send the message, but there's no two-way with
6   that website or with the server then -- that it receives the
7   message, say automatically send something back confirming the
8   order, when it will be sent, that sort of thing.  That --
9   that's our view of what an interactive website would be that
10  would really be pertinent to a minimum contacts analysis.

11           THE COURT:  Let's talk about New Generation's
12  website if we could, because during the course of our
13  jurisdictional discovery period, in my efforts to try to stay
14  on top of this one in Oregon, counsel provided me with a copy
15  of the court recommendation and -- from the Oregon Magistrate
16  Judge, and there is a reference to the New Generation website
17  in it.  And that website was being characterized in that
18  opinion, if I'm correct, as being passive, not interactive,
19  for the purposes of a minimum contacts analysis.

20           From your perspective, is the New Generation
21  website similar to the Slocum Enterprises website?  Should
22  they get treated -- should they be looked at as the same?

23           MR. COOPER:  You know, I have to tell you right
24  now, I don't recall all the facts that we had going in that
25  case, in terms of what New Generation's website did.

1  However, you know, if it did not allow for the kind of

2  electronic commerce transactions that I just described, there

3  would be no reason to treat them differently.

4          THE COURT:  Okay.  Well, I'll ask you folks about

5  that because that scenario was treated and, therefore, people

6  must have been advocating a particular way about the website,

7  because otherwise the Judge wouldn't have had any facts to

8  make findings against, and if it becomes a wash, then that --

9  each of your websites should be viewed the same way,

10 regardless of what coast you're arguing on.  We should

11 probably take that into account, although that, of course, is

12 not law of the case here.  It's certainly interesting because

13 people are making arguments to the Court.

14          Let's -- sticking again with the Slocum

15 Enterprises website, as described to the Court, it basically

16 allows you to see a list of the states and then if you were

17 interested in, you know, what does New Jersey have to order

18 for you to choose New Jersey, and up it comes, and you get

19 your list of licensed -- I guess it's licensed veterinarians

20 who could provide the services.

21          Why wouldn't the fact -- if the website is set up

22 that way, why wouldn't that be suggesting to the public who

23 would access the website, you want to buy in New Jersey, we

24 can hook you up with a New Jersey person?  Why wouldn't that

25 be advertising directed to New Jersey residents?

1          MR. COOPER:  Because we aren't advertising to New

2   Jersey residents.  They don't buy.  What happens is, it's a

3   service that's provided by a veterinary professional.  We

4   happen to license veterinary professionals, and supply them

5   with product to do surgery, but we don't see the connection

6   to the New Jersey citizens, you know.

7          THE COURT:  But what purpose -- why else would it

8   be set up that way?  And if you can -- I know you're not a

9   marketing person, you're a lawyer.

10          MR. COOPER:  Right.

11          THE COURT:  But in looking at it from a marketing

12   perspective, why wouldn't that be the kind of goal to tell

13   those who are looking to get that -- this process for their

14   pet, or dog -- or not a pet, whatever, why wouldn't it be

15   directed to the New Jersey folks and the Alaska folks, and

16   every other place that you folks do business?

17          MR. COOPER:  I understand that the website has

18   much more to do with speaking to veterinarians, not to the

19   ultimate consumers.

20          THE COURT:  But -- well, okay.

21          MR. COOPER:  Or maybe -- I guess I'm willing to

22   even say ultimate consumers.

23          THE COURT:  If the vets --

24          MR. COOPER:  I understand that our company is

25   looking at and providing a website that allows, say other

1   veterinarians, to learn about the T.P.L.O. procedure, and has

2   done this for years, and then it allows other veterinarians

3   across the country to see where the other Slocum-licensed

4   veterinarians are, as opposed to the direction that you're

5   going.  That's just my understanding of how it -- you know,

6   if we have a marketing focus here, my understanding of the

7   marketing is to -- and/or informational to veterinarians

8   throughout the country, not looking to -- we don't advertise

9   in such a way that we would hope to find, you know, to let

10  people know in Trenton that we're Slocum Enterprises, and if

11  you want to have a T.P.L.O. procedure, go to this licensee.

12          We just simply don't -- we don't communicate that

13  way to dog owners.  I think that our understanding is, dog

14  owners realize their dog has a problem with their leg, and

15  they go to their doctor to have that fixed.

16          THE COURT:  Well, maybe I shouldn't have been

17  taking it so far downstream.  If you're marketing -- if

18  you're directing your marketing activities to a market, it

19  appears that then you're saying, it would be at

20  veterinarians, not the ultimate persons who would benefit

21  from their services.  So then the question though -- it

22  doesn't really change, if there is a goal to determine what

23  New Jersey vets can provide this service, isn't it a tool for

24  veterinarians to be able to say, well, I'm not a person who

25  can do this rather sophisticated surgery, but if I jump on

1  the Slocum Enterprises website, I'll be able to find anyone

2  else in New Jersey who can do it.  Do you think that's a

3  sufficient contact or not?

4          MR. COOPER:  I don't.  Again, because it's a --

5  it's not purposefully directed to New Jersey, but rather

6  meets a national goal to let anyone know -- any veterinarian

7  throughout the country that they could access the Slocum

8  website and find out, throughout the country, not

9  particularly target any one state.

10          THE COURT:  Okay.  Let me ask you about the second

11  -- the second factor in the test, which is the arises from or

12  relates to part of the test.

13          In the -- and I'm sensitive to the fact that we're

14  here as a declaratory judgment, declaring non-infringement,

15  invalidity, and unenforceability to a patent held by an

16  Oregon entity, of course obtained through the Patent Office

17  in Washington.

18          Where would the conduct arise for the declaratory

19  judgment?  Where would that fact -- second factor arise?

20          MR. COOPER:  For which defendant?

21          THE COURT:  Let's -- we'll take Slocum Trust

22  first.  Let's take the Trust, since it's -- they're the

23  patent holder.

24          MR. COOPER:  Right.  And we're looking at, where

25  would conduct that the Slocum Trust has done arising out of

Argument                                  18

1  -- I guess it would have to be Oregon.

2            THE COURT:  Could it be the District of Columbia?

3            MR. COOPER:  I don't see that unless -- I

4  understand that you're talking about -- because they chose to

5  get a patent then --

6            THE COURT:  And it was issued from the patent

7  office in Washington.  Why wouldn't there be specific

8  jurisdiction for the purposes of this for the Trust, on the

9  arises and related to prong, in the District of Columbia?

10           MR. COOPER:  Getting -- they applied generally to

11 get the intellectual property right, but what this case is

12 about is whether that intellectual property right infringes

13 on New Generation's product.

14           THE COURT:  Well, it's partly -- it's also to

15 declare, if I look at the complaint as drafted --

16           MR. COOPER:  Right.

17           THE COURT:  -- to declare a patent issued out of

18 the patent office invalid or unenforceable.  So I'm wondering

19 why wouldn't D.C. be a place out of which this cause of

20 action could have arisen?

21           MR. COOPER:  And -- I agree with you there -- if

22 you go with that, if it's patent invalidity and -- at least

23 that second prong, we still wouldn't agree that the D.C.

24 would be -- THE COURT:  The infringement part you disagree?

25           MR. COOPER:  Well, not so much -- not only the

2e7b64ec110dd2b1

1   infringement part, but it's one part of a three-part test.

2   We wouldn't agree that there's personal jurisdiction there

3   either for reasons similar to or analogous to this case,

4   Slocum Trust's lack of contacts with D.C., but at least as to

5   the second prong that you're talking about, I'd agree with

6   you, at least analytically, that there would be the

7   possibility especially on a D.J., for invalidity.

8            THE COURT:  Okay.  All right.  Do you have

9   anything else that you wanted to add?

10           MR. COOPER:  Other than just to stress for you, to

11  consider as we did in our -- urged in papers, the lack of

12  specific direction to New Jersey.  I know that in your line

13  of questioning just before, it seems like you're still

14  looking that way, in terms of whether it would be the --

15  these licensees, the website, and listing New Jersey

16  licensees, but to really consider that what Slocum

17  Enterprises focused on their website is really to present a

18  national -- national information for veterinarians, wherever

19  they may be.

20           THE COURT:  Okay.  All right.  Thank you.

21           Okay.  I've read your papers, so if you have

22  something you'd like to add, and then I'll go through my

23  questions --

24           MR. FRISCIA:  Well, can I first start with the

25  slides?

Argument                                               20

1          THE COURT:  Sure.

2          MR. FRISCIA:  Because there's something about the

3  slides that I don't understand and I believe this is the

4  fourth slide, and the fourth slide indicates that there are

5  11 New Jersey licensees, but yet the third slide, I believe,

6  the bar graph, adds up to 12 New Jersey vets, and I don't

7  understand why there's a difference.

8          THE COURT:  All right.  Why don't we do the math

9  again and see.

10          MR. COOPER:  So we have one, two, three, seven,

11  nine, and 12.  He's correct.  And that -- I mean, it shows it

12  that way and I -- we just represented this graph from the

13  numbers that have been reported, and I believe that these

14  numbers originated from New Generation.

15          So the numbers I'm taking here were first in New

16  Generation's brief and we just adopted them.  My thought

17  would be that it's possible that there's a mathematical

18  mistake there.  What I've looked at and what I feel certain

19  about from the fluctuation of numbers that we've seen is the

20  number 11, just based on the document that was produced in

21  jurisdictional discovery that lists what I think are -- as I

22  recall, a table that has ten, and then footnotes with two

23  other licensees at the bottom, but there's a double there,

24  and that's where we get 11, 10, and one falls out, but one's

25  there so -- but it's down to one licensee, so the question

1  would simply be to clarify or find out after today why that
2  is, 12 versus 11.

3              THE COURT:  Okay.  Go ahead.

4              MR. FRISCIA:  I was under the understanding there
5  was 12.  I'm not certain, but nevertheless -- I was prepared
6  to speak on -- about information that I think that you have
7  digested based on your questions already thus far.

8              I do think, and maybe just to summarize, I do
9  think that both the Trust and the Enterprises conducts
10  business in New Jersey in a continuous and systematic
11  fashion.

12             THE COURT:  Okay.  So you're arguing general
13  jurisdiction?

14             MR. FRISCIA:  Yes.  And I also think that they
15  conduct substantial business in New Jersey based specifically
16  on the patented products.

17             THE COURT:  Okay.

18             MR. FRISCIA:  I don't think that the percentages
19  are what controls, and I would point out that over the last
20  two years, they have conducted approximately $30,000 of
21  business in New Jersey each year, and it's not just the
22  Enterprises, it's the Trust.

23             As you know, the Trust certifies trained New
24  Jersey veterinarians and enters into license agreements with
25  trained New Jersey veterinarians concerning the patents at

1  issue, and provides for obligations on those veterinarians,

2  and the Trust profits from the sales of merchandise to New

3  Jersey, because they own 100 percent of Slocum Enterprises.

4          So every time a New Jersey veterinarian or

5  consumer looks at the website and sees the New Jersey

6  certified vets, and has a procedure done, both the

7  Enterprises and the Trust make money.

8          THE COURT:  Okay.

9          MR. FRISCIA:  Would you like me to talk about some

10  of the other questions that you raised or should I --

11          THE COURT:  Yeah, I mean, I would.  I mean, you

12  want to -- maybe we should do it the same way, focus on the

13  Trust and then the website, I -- I'm sorry, the Trust and the

14  Enterprises.  I know that you're also making alter ego

15  argument, but we have to take first things first.  So tell me

16  about the Trust.

17          I mean from your adversary's perspective the Trust

18  limited number of licensees shows -- as compared to

19  nationally -- shows a lesser contact.  How do you respond to

20  the point that I raised with them about the obligation the

21  license itself imposes?

22          MR. FRISCIA:  I think it's -- I think it's very

23  clear that through the Trust there is a network of New Jersey

24  veterinarians that are essentially the eyes and the ears of

25  the Trust with respect to potential infringement matters.  So

 1  I think that -- I think that the Trust is -- has set up this

 2  network in New Jersey of people that are involved with their

 3  patents --

 4            THE COURT:  Okay.

 5            MR. FRISCIA:  -- and the Trust, because it makes

 6  money off of that.

 7            THE COURT:  Okay.  Let's talking about the arising

 8  out of or related to prong in the D.J. action.  What conduct

 9  by the Trust in New Jersey causes your cause of action to

10  arise from its actions?

11            MR. FRISCIA:  Well, again, the Trust licenses --

12  first of all, certifies trained New Jersey vets and then

13  enters into license agreements with those vets in New Jersey

14  and as far as -- and the Trust also profits from sales of

15  merchandise, including the patented merchandise in New

16  Jersey.

17            THE COURT:  Okay.  The -- under your analysis,

18  it's -- generally, the facts aren't in dispute, whether it's

19  11 licensees or 12.  The percentage of sales really aren't in

20  dispute.  From your perspective then, anywhere they sell that

21  there could be a profit could subject them to general

22  personal jurisdiction -- subject the Trust to general

23  personal jurisdiction?

24            MR. FRISCIA:  Yeah, well I think that when they're

25  doing business in an area and they're selling their patented

1   products and they have license agreements with veterinarians

2   in those areas, they would be subject to personal

3   jurisdiction.

4            THE COURT:  Okay.  Let's talk about the

5   Enterprises.  The Enterprises we have -- roughly you produced

6   140 or so invoices, or statements, or records of transaction

7   activity, whether it was a consummation of sale, payment for

8   the seminar, return of property, et al., the whole myriad of

9   stuff.  It still is less than 1 percent on the Enterprises of

10  its total sales.

11           We did a pretty thorough survey to see the

12  percentages and nothing -- I wasn't seeing anything in the

13  percentages that appear from the undisputed facts here would

14  give general personal jurisdiction over the Enterprises.

15           MR. FRISCIA:  Well, I think that's because

16  personal jurisdiction is not conditioned on percentages.

17           THE COURT:  No, it's a -- it's one of several

18  factors that the Court would look at, but in looking at the

19  cases, I mean, even less than 2 percent weren't being enough

20  -- even taking other -- other factors into account for --

21  were in general personal jurisdiction here, in continuous and

22  systematic contacts, and what other factors, in your opinion,

23  would show the Court there is general -- again, we're in

24  general jurisdiction Slocum Enterprises?  Where's -- what

25  else would be systematic?  And I assume you're going to point

1  me to the website because that was the other factor that was

2  emphasized and I'd like to talk to you about that.

3          MR. FRISCIA:  Yeah.  Well, the website is -- is

4  important to consider.  The website is more than passive.  It

5  -- first of all, on the first page of the website there is a

6  link to a page entitled, "Looking for a T.P.L.O. certified

7  veterinarian in your area?" with an alphabetical listing of

8  veterinarians with contact information.  So, you know, first

9  and foremost they are -- if a New Jersey resident looked at

10  the website, they can get real quickly to a listing of

11  certified vets in their area.  And so it's one click to a

12  listing that shows all the states, another click to New

13  Jersey, and then there's basically a New Jersey webpage that

14  lists all of the certified veterinarians in New Jersey.  It

15  lists them -- it tells you where they are geographically,

16  their town or city, and it provides their phone number.

17          I don't know if this is marketed at consumers to

18  allow them to pick the proper veterinarian, or if it's

19  marketed to veterinarians to allow for the referrals to

20  certified veterinarians, but nevertheless it's a pretty

21  strong marketing tool and it's available to anybody around

22  the country, but specifically, it's available to people in

23  New Jersey to find a local vet to practice the procedure.

24          There's a couple of other things.  The website

25  tries very, very hard to make it super easy to interact with

1   Slocum.  For example, one page of the website is entitled,

2   "Policy Questions."  And there's a question and answer setup

3   after that.  The first question is, "How do I set up an

4   account through Slocum Enterprises to order products?"

5   Answer:  Simply contact our office at our 800 number and

6   speak to one of our sales representatives.  Alternatively,

7   fax your request to our office and one of our sales

8   representatives will contact you."  So it's real easy.

9          They also have specific links set up for orders

10  and the e-mail address is orders@slocumenterprises.com.  They

11  have customerservice@slocumenterprises.com,

12  billing@slocumenterprises.com, and

13  seminars@slocumenterprises.com.  So the website is --

14  provides a real convenient means for somebody in New Jersey

15  to interact with Slocum.

16         THE COURT:  Tell me about New Generation's

17  website.  Your -- it was not found to be sufficiently

18  interactive in Oregon by -- according to the report and

19  recommendation of the Magistrate Judge.  Tell me how your web

20  -- the New Generation website is different and why is that

21  passive and theirs is interactive?

22         MR. FRISCIA:  Unfortunately, I have not been to

23  the New Generation website in a while.

24         THE COURT:  Okay.

25         MR. FRISCIA:  I do not -- first of all, I do not

1  believe that it has the -- the built-in functionality of the

2  Slocum website.  I'll point you to a couple of other things.

3        THE COURT:  If you don't know for sure though

4  about the New Generation website, I'd prefer you to say, I

5  don't know, than make a representation, okay?

6        MR. FRISCIA:  I don't know for sure, and I just

7  wanted to point out something else, which you jogged my

8  memory.  There are some templates at the -- in the Slocum

9  website for people to input information to receive product

10 information and announcements by e-mail, by fax, by regular

11 mail.

12        So anyway -- but yes, specifically I --

13        THE COURT:  Because I can tell you that at least

14 the Magistrate Judge in describing Mr. Quallos (sic)?

15        MR. FRISCIA:  Quellos (phonetic).

16        THE COURT:  Quellos's declaration, she makes -- he

17 or she makes the following finding, "The website does,

18 however, permit customers to order other specified products

19 directly over the internet and provides a telephone number

20 which customers can use to order one of its products.  Under

21 the cases discussed, I conclude the N.G.D. website is not

22 sufficiently interactive to satisfy the purposeful availment

23 requirement because the website does not describe or promote

24 the accused product or enable the internet browser to

25 purchase one, it also fails to meet the arises out of

 1 | requirement."

 2 |         So I mean the way that the New Generation website
 3 | was described in the report and recommendation, and the way
 4 | that it's been described -- the way the Slocum Enterprises
 5 | website's been described, their function seemed very similar.
 6 | I understand that the Magistrate Judge was talking
 7 | specifically about the arising out of in par, but I'm just
 8 | not sure how the New Generation website could be passive and,
 9 | therefore, not a basis upon which to exercise jurisdiction,
10 | but the New -- the Slocum Enterprises website could be
11 | active.

12 |         And I guess I'd ask you, is one of -- is there a
13 | distinction, if you know, that the Slocum Enterprises website
14 | has a specific New Jersey identifier that would list
15 | certified vets, but New Generation is not state specific?

16 |         MR. FRISCIA:  Well, I think that's one important
17 | factor, and I do think that the other portions of the
18 | website, relating to orders, billing, and that sort of thing,
19 | and setting up an account are more -- they're present on the
20 | Slocum website.

21 |         THE COURT:  Okay.  The other question I had for
22 | you had to do with this arising out of and/or related to
23 | issue.  The Slocum Enterprises, how is it that their conduct
24 | is sufficient to say that your D.J. action arises out or is
25 | related to their sales in New Jersey, or their activity in

Argument                                                                29

1   New Jersey? Because the sale of the product itself isn't

2   going to -- wouldn't necessarily make it an arising out of

3   case. So I was wondering how it is you satisfy that arising

4   out of or related to prong for Slocum Enterprises in New

5   Jersey.

6             MR. FRISCIA: Right. And I think what you're

7   making reference to is specific jurisdiction.

8             THE COURT: Yes.

9             MR. FRISCIA: And how do we say that there is

10  specific jurisdiction, and I point you to a quote from VP

11  Intellectual Properties, it's a District of New Jersey case

12  that says, "Regardless of the quantity of product sold or the

13  shipping method used, the sale of patented products to buyers

14  in the forum state creates specific personal jurisdiction

15  over an out-of-state seller."

16            THE COURT: But that -- but that's for when it is

17  the patent infringement case that's being brought in New

18  Jersey.

19            MR. FRISCIA: Yeah, that was the context of this

20  case, but I think applying that language we have an out-of-

21  state entity selling products in New Jersey and licensing a

22  patent in New Jersey, and we would submit it's those

23  activities that give rise to specific jurisdiction.

24            THE COURT: The sentence -- I know the sentence

25  you're talking about, I saw it in your brief, went back and

 1  looked at the case, and the sentence before it says, "In
 2  patent cases, law is clear where a defendant infringer is
 3  shown to have sold its allegedly infringing product in the
 4  forum state, the forum may exercise personal jurisdiction
 5  over the defendant..." and that's at Page 5 of the VP
 6  Intellectual Properties case.  So it looked to me that when
 7  you read that sentence, then you read the sentence that you
 8  just referenced, it's talking about -- in a case where you're
 9  talking about a defendant infringer, and you're not -- that's
10  not -- that's what this case is.

11          MR. FRISCIA:  It was -- it was clearly -- the
12  parties were reversed in that case.  We thought that the
13  quoted sentence was striking and had interesting
14  applicability to the present case, but nevertheless, I
15  understand that context-wise the situation was reversed.

16          However, again I think that the selling of the
17  products and the licensing into New Jersey gives rise to a
18  specific jurisdiction.

19          THE COURT:  Let me ask you about why wouldn't
20  there be -- would there be -- I shouldn't say why wouldn't
21  there -- would there be specific jurisdiction over Slocum
22  Enterprises in the District of Columbia, for your case, for
23  the D.J. action?

24          MR. FRISCIA:  It's an interesting question.  I've
25  never done any research to that.  I would point out -- well,

1  I just don't know if the fact that the Patent Office is

2  located in a specific jurisdiction that there would be --

3  that it would confer --

4           THE COURT:  Confer specific personal jurisdiction

5  over an enterprise, over-trump?

6           MR. FRISCIA:  Yeah.  I'm not sure it would.

7           THE COURT:  Okay.  Would you agree that at least

8  we would have the arising out of or related to activity could

9  have happened in the District of Columbia because it deals

10 with a patent issue there, that you're seeking to invalidate,

11 declare unenforceable, or have your product declare a non-

12 infringer?

13          MR. FRISCIA:  Yeah, it's an interesting idea and

14 I'm just afraid to comment on it without looking into the

15 issue.

16          THE COURT:  All right.  Do you have anything else

17 you'd like to add to your argument?

18          MR. FRISCIA:  Yeah, I did have one thing and that

19 was just to point out that the -- there's a New Jersey case,

20 the Provident National Bank case, where only about .066 of

21 the depositors resided in the forum and they contributed only

22 about .71 percent of the defendant's national total loan

23 deposits, and there was jurisdiction.

24          THE COURT:  Specific or general, do you know?

25          MR. FRISCIA:  General.

1          THE COURT:  They found general jurisdiction there.

2    Was it in the millions?  Because there is some case law that

3    talks about it might have been a small percentage of your

4    overall business, but when you're in the millions of dollars'

5    worth of business in a state that that may be enough, but if

6    you can give me that cite, we might take a quick look at

7    that.

8          MR. FRISCIA:  It was -- the cite is 819 F.2d at

9    435.

10         THE COURT:  Okay.  And do you have a -- is there a

11   pinpoint cite that you're -- page you guys are looking at?

12         MR. FRISCIA:  Yeah, that would be 435.

13         THE COURT:  Oh, that's -- 435 is the specific

14   cite?

15         MR. FRISCIA:  Yeah.

16         THE COURT:  Okay.

17         MR. FRISCIA:  I -- and just to add, I see a lot of

18   cases where the percentage isn't necessarily mentioned and I

19   think it's because it's not -- there's no -- there's no sort

20   of point for -- a point where the percentage is -- there's no

21   -- I'm trying to figure out the right word.  But there's no

22   line of -- there's no threshold --

23         THE COURT:  There's no magic number.

24         MR. FRISCIA:  There's no threshold number.

25         THE COURT:  No, I think -- and I think that's

1   right.   The courts are looking at the percentage of sales out
2   of total sales is among the factors considered, and in
3   looking at this case, and looking at what looks like pretty
4   much undisputed facts, it's not that we have Mr. Slocum or
5   Mrs. Slocum coming to New Jersey.   We don't have the seminars
6   we here.   We don't have a distributorship here in the classic
7   sense of, it's a distributor who's got its own series of
8   distribution recipients.   You do have a vendor of the
9   product, as well as the person who's implementing the
10  product.   You don't have bank accounts, you don't have
11  property.   So you look at the general jurisdiction stuff, and
12  really what you're left with here for both the -- for
13  Enterprises, you have numbers of sales and amount of the
14  total percentage and the website.

15          For the Trust you have the number of licensees,
16  the terms of the license, and the fact that monies earned
17  from activities in this district benefitted the Trust.
18  That's really what we end up with when you distill it all
19  down.   Those are the factors that exist for the Court to look
20  at to determine if there's sufficient contact and whether
21  it's general or personal.

22          I don't think I missed -- I don't know -- if I
23  missed any, please tell me.

24          MR. COOPER:   I just highly dispute your last one,
25  and I'll make that point in just a moment.

1             THE COURT:  The profits going to upstream?

2             MR. COOPER:  Yeah.

3             THE COURT:  I mean, you think it's a little --

4  it's like a thousand dollars for 20 you make or some --

5             MR. COOPER:  Well, actually I just think it's

6  impossible and completely unsupported for Mr. Friscia to even

7  make that point in that he has to first pierce the corporate

8  veil or show, you know, any of the eight factors to actually

9  get to a point that there's --

10             THE COURT:  I'm not even talking about piercing,

11  but I thought under the license if you're -- if -- and I

12  think it's probably the license that goes from the Trust to

13  the Enterprises, that if a certain number of dollars from a

14  licensee is made, some payment is made back to the Trust?

15             MR. COOPER:  Yes.

16             THE COURT:  So there has to be -- I mean, there's

17  some benefit the Trust gets, not for piercing purposes, but

18  from activity by the licensees?

19             MR. FRISCIA:  Yes.

20             THE COURT:  I'll let you finish and I'll let you

21  jump in.

22             MR. FRISCIA:  But even further, then when all is

23  said and done, all the profits go to the Trust.

24             THE COURT:  Because they're one and -- the

25  Enterprise is wholly owned by the Trust, right?  Wholly owned

1    might be the wrong word, but that's what I understood it to

2    be.

3              Did you want to respond to that?

4              MR. COOPER:   Yeah, I guess that's the one point --

5    Mr. Friscia thinks that because you have a wholly-owned

6    subsidiary set up that then he gets -- you get to just impute

7    all the profits -- any of the business the sub does, the

8    parent does, regardless of whether you followed the rules or

9    not.   All the facts of record show that these are completely

10   separate entities and there's absolutely nothing improper

11   about the idea of the Slocum Trust being a wholly -- wholly

12   owning the Slocum Enterprises, and until Mr. Friscia shows

13   under-capitalization, under-funding, any of the eight factors

14   that we described to be able to say the kinds of things he's

15   saying here today in court are -- are meaningless.

16             THE COURT:   Well, I think --

17             MR. COOPER:   He simply has a wish list to say

18   that's the way it is and they -- the Trust owns the

19   Enterprises, therefore, all the profits the Enterprises makes

20   in New Jersey are imputed to the Trust, and that -- you just

21   can't even come close to saying that until -- and it's his

22   burden to show how -- what, in the facts that we have so far,

23   dispute what's already of record, which is that they -- they

24   have separate records, separate accounts.   I think Tracy

25   Slocum has shown that she's been extremely specific and

1  careful in following her attorney's advice on how to set up

2  these entities.

3         So that's my point, you know.  I understand what

4  you were saying as far as the -- whether there's a payment

5  with each licensee, but what I'm talking about is Mr. Friscia

6  is standing here today and saying well, we can do away with

7  the fact that there's two defendants here quickly, you just

8  -- the one owns the other one, so everything one does is

9  imputed to the other.  It's just not that simple.

10         THE COURT:  I don't know that -- although that's

11  their alternative argument is alter ego, I think that what I

12  understood and, Mr. Friscia, correct me if I'm wrong, what I

13  understood the argument to be is, the Trust gets a benefit by

14  -- from its activities in New Jersey beyond the eyes and ears

15  of the patent -- the licensee -- veterinarians were carrying

16  out the responsibilities under the license.  The Trust is

17  benefitting financially in some way, right?

18         MR. FRISCIA:  Yes.  Not only from the license fee,

19  but also from the residual profits.

20         MR. COOPER:  And there's my point.  He keeps

21  saying and the residual profits, like that gets to -- that's

22  exactly -- for him to be able to make that argument, he has

23  to pierce the corporate veil.  He can't have it both ways.

24         THE COURT:  But I don't -- but there's no doubt --

25  not only do they get the licensing fee, but is there a

Case 2:04-cv-02583-KSH-PS Document 30-3 Filed 06/14/05 Page 38 of 51 PageID: 722

1  dispute that dollars earned by Enterprises, which is owned by

2  the Trust, gets -- gets ignored?  I mean, the Trust still

3  gets some benefit out of the continued sales.

4       MR. COOPER:  But that benefit's irrelevant to the

5  personal jurisdiction analysis until you can pierce the

6  corporate veil and show that that really -- that's a valid

7  conclusion.  It's just -- that's the -- that's the law of any

8  minimum contacts case, and what Mr. Friscia is doing is

9  ignoring our arguments up to today.

10       You know, in the briefs they've never -- they just

11  decided it's simple, the profits, certainly they benefit from

12  it, if Slocum Enterprises does well, so does Slocum Trust so,

13  therefore, impute all the -- all the business that Slocum

14  Enterprises does to the Trust, and that's simply -- there's

15  no support under the law for something like that.

16       THE COURT:  Counsel, go ahead.  Did you want to

17  respond to that?

18       MR. FRISCIA:  You know, I believe, and I don't

19  have it handy, but there's specific testimony to this effect

20  that the profits go to the Trust.  I'll -- I don't have it

21  handy though, but I'm not trying to in these statements

22  pierce the corporate veil, I'm just thinking -- I'm stating

23  what is a fact, and that is, if one entity owns another

24  entity, the profits go to the owning entity.

25       MR. COOPER:  And I won't disagree, and we'll note

1  that's exactly right, that the -- but again, I think we're

2  not -- we're not talking the same thing.  We're not meaning

3  -- in the sense that there's no dispute, I think in the

4  record, that Slocum Trust is the wholly-owned -- wholly owns

5  the Enterprises.  So profits from the Enterprises go to the

6  Trust.  There's no dispute as to that.

7          But my dispute with you is that you are not

8  recognizing -- you think then, bingo, all of that applies to

9  a minimum contacts jurisdictional analysis, and my point is

10 that it doesn't at all, because that's simply a corporate or

11 business organization setup.  For you to then be able to

12 impute the contacts of the sub to the parent, or in this

13 case, to the Trust, you have to pierce the corporate veil.

14 You can't just simply -- well, there's the fact, therefore,

15 we're done.  If that's true, why do and how do companies set

16 up parent and sub relationships?  One fundamental reason for

17 that is so that they don't subject the parent to

18 jurisdictions -- specific jurisdiction in every state in the

19 country or everywhere one of the subs does business.  It's

20 just not that simple, but that's just my point.

21          THE COURT:  Okay.  Well, I want to go check this

22 one quick cite at 819 F.2d.  Do you know the case?  Do you

23 know which case he's talking about, the Provident case?

24          MR. COOPER:  I do.

25          THE COURT:  Okay.  All right.  So give me a couple

1  of minutes to check that and I'll be out.

2            (Recess from 11:01 a.m. to 11:04 a.m.)

3            THE COURT:  Counsel, did you want to add

4  something?

5            MR. FRISCIA:  I did, actually.

6            THE COURT:  Go ahead.

7            MR. FRISCIA:  If you wouldn't mind, but on Page

8  189 of --

9            THE COURT:  Of?

10           MR. FRISCIA:  -- the declaration of Theresa Slocum

11 --        THE COURT:  Okay.

12           MR. FRISCIA:  I'm sorry, transcript of the

13 deposition of Theresa Slocum, it says:

14           "Question:  But my larger question was, since the

15 Trust wholly owns Slocum Enterprises, all of the profits from

16 the Enterprise -- Slocum Enterprises, flows to the Trust?

17           "Answer:  That is correct.

18           "Question:  So the more sales of patented products

19 that the Enterprise makes the greater the profits to the

20 Enterprise and, therefore, the greater the flow of income

21 into the Trust, right?

22           "Answer:  Correct."

23           THE COURT:  All right.  And I remember that

24 testimony.  I think it's just a matter of -- I don't think

25 there's a dispute that that is a truthful account.  Your

Case 2:04-cv-02583-KSH-PS Document 30-3 Filed 06/14/05 Page 41 of 51 PageID: 725

1  question -- your statement is, it's not sufficient to
2  exercise jurisdiction over the Trust, just because it's for
3  the profits -- every dollar made in New Jersey flowed through
4  to the -- to the Trust ultimately, your position is it's not
5  sufficient?

6          MR. COOPER:  Correct.  And it's a legal -- Mr.
7  Friscia thinks this is a factual point, and what he allows
8  himself to do is ignore the business organization of the two.
9  There is no dispute -- and those questions there only
10  supplement what was stated before, which was that you could
11  say all that by simply saying, as to the question, is the
12  Slocum Enterprises wholly-owned by the Trust?  And the answer
13  is yes.  So the -- it just is simply not the law.  There's no
14  legal support for Mr. Friscia to make the legal conclusion
15  based on that fact, that that fact means he can impute all of
16  the business contacts and profits of the Enterprises to the
17  Trust for purposes of establishing personal jurisdiction.
18  That's simply not the law.

19          THE COURT:  Okay.  Counsel?

20          MR. FRISCIA:  I don't know if I'm overextending my
21  welcome, but I did have two more items to mention.

22          THE COURT:  It's your argument, go ahead.

23          MR. FRISCIA:  One is the Pennsylvania case,
24  Gallants v. Fosdick, 320 Pa. Super. 38 (1983) the fact that
25  only a small percentage of total income was attributable to

 1    forum activities was irrelevant so long as the small

 2    percentage represented continuous and substantial business

 3    within the state.

 4              I also wanted to point to the Federal Circuit case

 5    of Trintec where the case was remanded by the Federal Circuit

 6    for discovery, and in that case the sales involved were

 7    relatively small.  For example, 2,700 in 2002, 4,100 in 2003

 8    compared to sales -- annual sales in the millions.  So the

 9    fact that the sales were a small percentage did not

10    automatically mean there was no jurisdiction.

11              THE COURT:  I agree with that observation.  I

12    think it's a factor that needs to be considered and I have

13    been trying to distill from the submissions and the arguments

14    what are the factors, and I think we've kind of identified

15    what they are.  The Trintec case perhaps had other factors.

16              MR. FRISCIA:  Like -- like I would suggest ours

17    does with the website and the --

18              THE COURT:  I -- we took a look at the Provident

19    case, and as I sort of suspected, it involves millions of

20    dollars of movement of funds between two financial

21    institutions and at least the Third Circuit made note of the

22    fact that the bank account activity -- or the bank account --

23    strike that -- in Pennsylvania was daily -- there was daily

24    access between the bank account in Pennsylvania and the

25    California entity, so they found that to be substantial and

 1  continuous contact.

 2          So I'm not sure that that is analogous here

 3  because no one is suggesting regular daily activity --

 4  activity no less or contacts, and from the submission of the

 5  transaction records over the period of years that were

 6  submitted, it doesn't -- it doesn't equate to one T.P.L.

 7  procedure a day for four years.  We don't have that, it's 140

 8  over -- I don't know if it was a four-year period or so that

 9  the records that were submitted reflect.

10          Okay.  Well, I appreciate your arguments and the

11  written submissions which were very helpful.  Let me tell you

12  where I'm at.  I am -- as you know, this was referred to me

13  by Judge Hayden for a report and recommendation.  I am

14  prepared to issue a report and recommendation and I'm

15  prepared to put an opinion on the record.  I'll tell you what

16  I'm prepared to report and recommend, however, I'm going to

17  ask you whether or not this case should be transferred to the

18  District of Columbia or somewhere else there's personal

19  jurisdiction and venue of course.

20          There is authority, even if the absence of

21  personal jurisdiction, that a Court may transfer a case to a

22  place it could otherwise have been brought.  So I will give

23  you the benefit of my thoughts on this, so I am prepared to

24  recommend, both as to the Enterprises and to the Trust, that

25  she dismiss the case for lack of personal jurisdiction unless

1   I decide, based on your submission, that this case could be

2   transferred either to the U.S. District Court in the District

3   of Columbia, back to Oregon, or some other place where

4   there's jurisdiction over the parties and venue over the

5   cause of action.

6           I've gone through the analysis that is articulated

7   by the Federal Circuit on both general personal jurisdiction

8   and specific personal jurisdiction as to both entities, and

9   for the reasons in the opinion I'm going to deliver, I didn't

10  see the threshold being met here, and for those reasons I'm

11  prepared to do that, but it won't be effective until I see

12  your letters.  And I was hoping to get letters simultaneously

13  by Thursday, because I know that this case should move along,

14  and maybe in your discussions you'll both agree that the

15  District of -- again, I looked at the District of Columbia as

16  a possibility because I looked at the arising at and related

17  to, and it relates to the issuance of a patent, whether it's

18  valid or invalid.  And I understand your argument is, it

19  doesn't matter about the -- it doesn't help on the

20  infringement point.

21          Nonetheless, it did strike me as potentially a

22  place that this case could be resolved.  As you know from

23  other conferences we've had off the record, at either the

24  settlement or at our jurisdictional discovery discussions,

25  I've been hoping to find you a home.  I made my call based on

1    the information as I saw it and the legal principles, and I

2    will deliver the opinion.

3              My intention is I'll get your letters Thursday,

4    and  very shortly thereafter there'll either be an order

5    transferring the case or an order recommending that Judge

6    Hayden dismiss for lack of personal jurisdiction, and you'll

7    have ten days from that order to do whatever you need to with

8    Her Honor, appeal or whatever.

9              But I tell you this now because you'll need to

10   order -- I'm going to read it into the record, so you'll need

11   to order a transcript.

12             Now I have another motion that's supposed to

13   start, and I don't know if counsel are in the hallway.  If

14   they're not here, I certainly could begin to deliver the

15   opinion.  You're not obliged to stay and listen.  No offense

16   will be taken, but if they're here, I am going to start their

17   argument.

18             So I'm going to ask if you could just -- the case

19   is Pullin?  Okay.  Thanks.

20             If they're ready to go, then I'm going to take

21   them and then deliver this later on, probably -- whenever I

22   finish with those folks, and it will probably be in the same

23   amount of time we've been together.

24             Do you have a preference?  Do you want to stay and

25   listen?  You'll be able to order the transcript, you don't

1  have to stay.

2              MR. COOPER:  The transcript's fine for me.

3              THE COURT:  Okay.

4              MR. FRISCIA:  If it's now, I'll stay.

5              THE COURT:  Okay.

6              MR. FRISCIA:  Subsequently --

7              THE COURT:  Okay, we'll find out any minute now.

8              The issue on the transfer, if there's another --

9  if there's a place you think this can go that I haven't

10  thought of, please speak up, but I mean, I was trying to look

11  at this to determine where -- where could be your home.

12             And I mean, I know your view -- and I appreciate

13  you candid answers like, we don't know whether the

14  application, you know, applying to the Patent and Trademark

15  Office, confers specific jurisdiction over the patent holder.

16             MR. COOPER:  And what -- I guess a couple of

17  points I just -- as I thought about it some more.  I -- when

18  I was talking with you, we were just talking about the

19  arising of, one of the three parts as opposed to --

20             THE COURT:  Well, that's the thing that hit my

21  head -- hit me -- drew my attention.

22             MR. COOPER:  What I hear you talking now is from

23  that point to saying could that then confer jurisdiction, as

24  in meet all three parts of the test.

25             THE COURT:  Well, you need to -- I mean, you're --

1  I'm talking transfer so I'm in, you know, is there proper

2  venue, is there personal jurisdiction, so we're 1404, 1406.

3  Each of them seem to suggest that at the outset you have to

4  have a place it could have otherwise been brought --

5              MR. COOPER:  Right.

6              THE COURT:  -- and that usually has that same

7  language, arising out of or related to, because I know the

8  defendants only reside in Oregon and Oregon doesn't have

9  personal jurisdiction over New Generation, so --

10             MR. COOPER:  Yet, there'd be plaintiff there, so

11 they -- they could certainly --

12             THE COURT:  They could choose to and maybe --

13 maybe they will decide to.  Ms. Creegan, is there anyone out

14 there waiting for us?

15             THE CLERK:  Judge, I looked down the hallway,

16 there was no one.

17             THE COURT:  Okay.  Then maybe what we'll do is, if

18 you don't mind, we'll give them until like 11:30, then I'll

19 ask either you or others if you can make a phone call for me

20 to counsel, and the materials are just here.

21             So if you don't mind then, Counsel, since they're

22 not here, I'd like to just at least -- if you want to leave,

23 you can, but I'd like to read this into the record if I

24 could.

25             MR. COOPER:  That's fine.

1           THE COURT:  This matter is before the Court on the

2    motion of defendant Slocum Enterprises, Inc., Slocum

3    Enterprises, and the D. Barclay Slocum Trust Agreement,

4    hereinafter the Slocum Trust, and collectively referred to as

5    the defendants or Slocum, to dismiss plaintiff's New

6    Generation Devices, Inc.'s complaint for lack of personal

7    jurisdiction.

8           The Honorable Kathryn S. Hayden referred this

9    dispositive motion to me for a report and recommendation.

10   For the following reasons, the Court is prepared to recommend

11   to Judge Hayden that she dismiss the complaint for lack of

12   personal jurisdiction unless the Court decides to transfer

13   this case to the U.S. District Court of the District of

14   Columbia, the District of Oregon, or another Federal Court

15   that would be an appropriate forum.

16          This is an action by New Generation for a

17   declaratory judgment of invalidity, unenforceability, or

18   alternatively, non-infringement of the patents owned by the

19   Slocum Trust.  By way of background, D. Barclay Slocum

20   invented a method of veterinary orthopedic surgery called a

21   Tibial Plateau Leveling Osteotomy, T.P.L.O., and obtained

22   patents for the method and devices used in this procedure,

23   including U.S. Patent Nos. 5304180, the T.P.L.O. plate

24   patent, and 4677973, the T.P.L.O. method patent, hereinafter

25   collectively referred to as the T.P.L.O. patents.  See the

1  declaration of Theresa Slocum at Paragraph 2.

2          The T.P.L.O. method patent expired in July 2004.

3  See her declaration at Paragraph 3.  In 1986 D. Barclay

4  Slocum formed Slocum Enterprises, an Oregon corporation, with

5  its principal place of business in Eugene, Oregon.  The

6  Slocum Enterprises -- strike that --

7          See her declaration at Paragraph 8.  The Slocum

8  Enterprises conducts training seminars, manufactures and

9  sells to veterinarians devices that embody the T.P.L.O. plate

10  patent.  See her declaration at Paragraphs 1 and 4.

11          Ms. Slocum is the President of Slocum Enterprises.

12  See her declaration at Paragraph 8.  Slocum Enterprises has

13  no employees, sales representatives, bank accounts,

14  manufacturing activities, inventory, equipment, or other

15  assets in New Jersey, and does not pay taxes, advertise, or

16  hold seminars in New Jersey.  See the declaration at

17  Paragraph 8.  I note that it does host a website that has

18  information about their products, and one could argue seeks

19  to advertise their products and the veterinarians authorized

20  to use them.

21          Slocum Enterprises has sold products to New Jersey

22  veterinarians and shipped these products to these

23  veterinarians in New Jersey.  See the declaration of Scott

24  Christie, Exhibit C, which attaches on Ms. Slocum's

25  deposition at Page 98, Lines 10 to 21; Page 173, Lines 8

Court Decision                                                    49

1    through 16; Page 113, Line 13 through Page 114, Line 15; and

2    Page 352, Line 9 to 353, Line 5.

3           Slocum Enterprises New Jersey sales were $12,609

4    in 2002; $21,228.05 in 2002; $30,554.42 in 2003; and

5    $29,642.59 in 2004.  See Exhibit B to Mr. Christie's

6    declaration.  These sales were made to, I gather, it's 11 New

7    Jersey veterinarians representing an average of .766 percent

8    of Slocum Enterprises' total sales.  See Ms. Slocum's

9    declaration at Paragraph 11.  Attendant with those sales,

10   Slocum Enterprises sent 143 invoices and 67 statements to New

11   Jersey.  See Mr. Christie's declaration as Exhibit B and Ms.

12   Slocum's deposition at Page 352.

13          Besides general sale of the products, the invoices

14   reflect returns for maintenance of equipment.  See Mr.

15   Christie's declaration, Exhibit B, at Bates Nos. 03126,

16   03127, 03192, 03194, and 03436.  Purchase of replacement

17   parts, see Bates No. 03203.  Loaned equipment, see Bates

18   Number 03257 and 03195.  And billing for attendance at

19   seminars, see Bates Nos. 03219, 03220, 03226, 03227, and

20   03228.

21          Slocum Enterprises operates a website that

22   advertises and provides information about its products where

23   veterinarians can obtain information about seminars and

24   products.  See Ms. Slocum's declaration at Paragraph 9 and

25   Mr. Christie's declaration at Paragraph C, as well as the

1 | Slocum deposition at Page 87, Lines 1 to 4.

2 | The website also lists by state veterinarians who
3 | have received T.P.L.O. training certification through Slocum
4 | Enterprises.  See the Slocum declaration at Paragraph 10.  In
5 | her capacity as trustee of the Slocum Trust, Ms. Slocum
6 | certified that the veterinarians attended the seminars that
7 | were offered, and this included at least seven New Jersey
8 | veterinarians who had attended these training seminars.  See
9 | Mr. Christie's declaration at Exhibit C, Ms. Slocum's
10 | deposition at Pages 368 to 369.

11 | Through the website, potential customers may also
12 | request additional information about products and the
13 | seminars be forwarded to them via mail, fax, or e-mail, by
14 | entering their contact information on the website.  See the
15 | Slocum declaration at Paragraph 9.  The website contains a
16 | link entitled, billing, and a link entitled, orders, through
17 | which a customer, presumably, may e-mail product orders.
18 | There's been some clarification about this today on the
19 | record, where counsel has represented you couldn't actually
20 | consummate a complete purchase, but the information about the
21 | website is attached to Mr. Christie's declaration at Exhibit
22 | C, and discussed in Ms. Slocum's deposition at Page 91, Lines
23 | 6 through 15, and Page 92, Lines 5 through 23.

24 | Ms. Slocum testified customers may purchase
25 | instructional videos "through" the website.  See her